***NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

**Electronically Filed
Supreme Court
SCWC-30442
25-AUG-2021
07:49 AM
Dkt. 43 SO**

SCWC-30442

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

ALBERT VILLADOS, JR., also known as ALBERTO VILLADOS, JR.,
Petitioner/Defendant-Appellant.

---

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 30442; CR. NO. 08-1-0155(2))

SUMMARY DISPOSITION ORDER
(By: Recktenwald, C.J., Nakayama, McKenna, Wilson, and Eddins, JJ.)

## I. INTRODUCTION

Petitioner/Defendant-Appellant Albert Villados, Jr., was arrested after a raid of his Maui home, which he shared with his girlfriend, Amy Bautista, and a roommate. The raid uncovered a fanny pack containing methamphetamine in the living room common area. Villados was convicted of possession of the methamphetamine and of paraphernalia. During the jury trial, Bautista testified for the State about Villados's prior drug

activity, including testimony that: Bautista was addicted to methamphetamine, and Villados had given her drugs from the fanny pack more than a dozen times; she saw Villados with an ounce of methamphetamine at the house; she saw him use digital scales to break down methamphetamine; and she saw him place the broken-down methamphetamine into smaller plastic bags.

We agree with Villados that the admission of this testimony contravened Hawai'i Rules of Evidence (HRE) Rules 404(b) and 403 because it was propensity evidence that suggested that Villados was a drug dealer. The evidence suggested Villados was engaged in more culpable activity – drug trafficking – than the crime for which he was charged – mere possession. Accordingly, the evidence presented a significant risk that the jury improperly convicted Villados based on their perception of his bad character, and his conviction must be vacated.

## II. BACKGROUND

### A. Circuit Court Proceedings

In 2008, Villados was charged in the Circuit Court of the Second Circuit (circuit court)[1] with one count of Promoting a Dangerous Drug in the Second Degree in violation of Hawai'i

---

[1] The Honorable Shackley F. Raffetto presided.

Revised Statutes (HRS) § 712-1242(1)(b)(i) (Supp. 2007)[2] and

Prohibited Acts Related to Drug Paraphernalia in violation of

HRS § 329-43.5(a) (2010).[3]  The former charge related to the 9.35

grams of methamphetamine found in a fanny pack in Villados's

living room, and the latter related to the fanny pack itself;

small plastic baggies, a cut plastic straw, and the eyeglass

case found inside the fanny pack; and digital scales recovered

from Villados's bedroom.

### 1.    Pretrial Rulings on HRE Rule 404(b) Evidence

Villados initially chose to represent himself, and

during that period, the State filed a "Notice of Intent to Rely

on Potential Rule 404(b) . . . Material."  The notice stated

---

[2]    HRS § 712-1242(1)(b)(i) provides: "A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly[] . . . [p]ossesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of[] [o]ne-eighth ounce or more, containing methamphetamine[.]"

[3]    HRS § 329-43.5(a) provided in 2008:

> It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.  Any person who violates this section is guilty of a class C felony[.]

Prohibited acts related to drug paraphernalia is now only a violation.

The jury was instructed that Villados was guilty of this count if he "did intentionally use, or possessed with intent to use, objects, to wit, a fanny pack, plastic packets, a cut straw, digital gram scales, and/or an eyeglass case, to store, contain, conceal, prepare, ingest, inhale, or otherwise introduce into the human body a controlled substance."

3

that the State would seek to introduce evidence that Bautista, who was living with and in a relationship with Villados at the time, saw Villados buy a Maui Built fanny pack in which he carried methamphetamine; that Bautista had observed Villados come home with an ounce of methamphetamine; that she had seen Villados break down methamphetamine into smaller quantities at the house; and that "whenever Bautista wanted to use crystal methamphetamine, . . . [Villados] would retrieve a packet . . . from his fannypack and give it to her[.]"

At the hearing on the notice, the court explained to Villados what HRE Rule 404(b) prohibited and the testimony that the State intended to introduce; the court indicated that "[its] opinion after reading [the notice] is that [the] evidence is admissible under [Rule 404(b)]" because "it shows intent." At the end of the same hearing, Villados asked for his standby counsel to resume representing him, to which the court agreed.

With the assistance of counsel, Villados filed a Motion to Reconsider regarding the 404(b) material in which Villados objected to all of Bautista's testimony regarding his past drug possession or use, specifically:

> i. Any testimony that on prior occasions Bautista saw defendant Villados use a Maui Built Fannypack to carry packets of crystal methamphetamine;
> ii. Any testimony that Bautista observed defendant Villados come home with up to an ounce of crystal methamphetamine in his possession[;]
> iii. Any testimony that prior to traveling to Honolulu for Valentines Day in 2008, that Bautista observed defendant Villados possessing an ounce of crystal methamphetamine,

4

and observed him break down the ounce down into smaller packets of half gram quantities;
iv. Any testimony that Bautista observed Villados break down one ounce quantities of methamphetamine into halves, one as a half ounce quantity kept in the original bag, and the other half into small quantities;
v. Any testimony that Bautista observed Villados breaking down the drugs either on the kitchen counter, or on the dining room table using a digital scale;
vi. Any testimony that after Villados would break down the drugs into smaller quantities, Bautista would observe Villados placing the packets into his Maui Built Fannypack;
vii. Any testimony that whenever Bautista wanted to use crystal methamphetamine, she would let Villados know, and he would retrieve a packet of crystal methamphetamine from his fannypack and give it to her.

Villados contended that State v. Steger, 114 Hawai'i 162, 158 P.3d 280 (App. 2006), a factually-similar case upon which the State relied, was distinguishable. Unlike the defendant in Steger, Villados did not face charges of methamphetamine trafficking or distribution – only possession. Villados argued that "Bautista's testimony of prior bad acts – regardless of any probative value – is inflammatory and unfairly prejudicial [such] that it should be barred by HRE 403." The court, "taking into consideration State v. [Steger] and the circumstances of this case, f[ound] that [the prior bad act testimony] is not . . . unfairly prejudicial, and so . . . den[ied] the motion."

### 2. Trial

The following evidence, as relevant to this case, was adduced at trial. Maui Police Department (MPD) Officer Randy Esperanza testified to executing a search warrant for Villados's person and home. Bautista, Villados, and their third roommate,

5

Mandy Marinas, were detained outside while the police conducted the home search.

Officer Esperanza described finding a camouflage-patterned Maui Built fanny pack behind the television in the living room.  He found a brown eyeglass case in the fanny pack; inside the eyeglass case were three plastic packets containing crystal methamphetamine.[4]  Officer Esperanza also found a cut straw, empty plastic packets, and over $2,000 in cash in the fanny pack.  There were two ID cards wrapped in the money: Villados's driver's license and Bautista's Hawai'i state ID.

On cross-examination, Officer Esperanza testified that Villados was not found holding or possessing the fanny pack and that the living room, where the fanny pack was found, was a common area accessible to everyone in the house.  The search of Villados's person and car also did not yield any evidence, nor were there fingerprints found on the contents of the fanny pack.

Officer Esperanza also recovered digital gram scales from Villados and Bautista's bedroom.  On cross-examination, he testified that it was clear the bedroom was occupied by two people and that Villados was not seen touching the scales.

---

[4]     Villados stipulated that the substance was in fact 9.353 grams (more than one-eighth ounce) of methamphetamine.

In the kitchen, the officers found "a black and yellow torchlighter, glass bong, and . . . and an empty box for a . . . scale" matching the brand of the scale in Villados's room.

The police also searched Marinas's room, where Officer Esperanza testified to finding other paraphernalia, including plastic packets containing residue that tested positive for cocaine. On cross-examination, Officer Esperanza admitted that there was methamphetamine in Marinas's room as well. Marinas was not charged.

Bautista testified that she was incarcerated at Maui Community Correctional Center because of her involvement with drugs in this case, and that she was recovering from addiction to methamphetamine and receiving treatment in Maui Drug Court. Villados was her ex-boyfriend, and she had agreed to testify against him as part of her plea deal.

Baustista testified that the eyeglass case found in the fanny pack belonged to Villados and that she went with Villados to Maui Built when he bought the fanny pack. She further testified that the methamphetamine found in the eyeglass case belonged to Villados:

> [State:] . . . . [D]o you recognize what's inside that
> brown eyeglass case?
> [Bautista:] Yeah.
> Q. What is that?
> A. It is methamphetamine. It's dope.
> Q. Methamphetamine?
> A. Yes.
> Q. Okay.
> And who did that belong to?

A. Junior.[5]
Q. Junior?
A. Uh-huh.
Q. Okay. Now, the day the police came into the house and searched the house, was this methamphetamine and this fanny pack and the brown eyeglass case, was that all belonging to Junior?
A. Uh-huh.
Q. And how about the money that was found in the photo?
A. That's Junior's.
. . . .
Q. And the two IDs there, did one of them belong to you?
A. Yes. That was my ID, but I kept that one in my drawer because I couldn't use it.
Q. Okay. So that is a State ID belonging to you?
A. Yes.
Q. Did you put it in the fanny pack?
A. No.
Q. Did you put drugs in the fanny pack?
A. No.
Q. Did you ever go inside the fanny pack?
A. No.
Q. After the defendant bought it, did he ever let you handle it?
A. No.

The State then asked whether Villados had

methamphetamine at the house:

Q. Now, while you were living there, did you ever see him come home with methamphetamine?
A. I seen him with meth at the house.
[Counsel for Villados:] Your Honor, I need to renew my objection at this point. 404(b).
THE COURT: All right. Overruled.
[State:] Okay. You saw him with methamphetamine at the house?
A. Uh-huh.
Q. About how much did you see him with?
A. It was like an ounce.
Q. And did you ever see him break it down into smaller packets?
A. Yes.
Q. And did you see him -- where did you see him doing that at?
A. In the table -- on the table in the living room, or like in the dining area.
Q. And was he using anything to weigh it?
A. Yes.

Villados objected again at this point on the basis of

_____

5       Bautista referred to Villados as Junior.

8

leading questions, which the court overruled.

Bautista testified that she saw Villados "break down the drugs" with the digital scale. The State asked, "And when you saw him using the drug scales to break down the methamphetamine, did he place it into smaller plastic packets?"; she replied, "Yes." She further testified that she saw Villados put methamphetamine into the fanny pack. When she was living with him, she was still addicted to methamphetamine, and she testified that Villados would give her methamphetamine from the fanny pack – this happened "[m]aybe twelve or fifteen times." She testified that she used "my bong and my torch" found in the kitchen to smoke it. Bautista further testified that Villados tried to convince her to "take the blame" for the fanny pack, both on the day of the search, and on multiple occasions thereafter.

Melissa Montilliano, "a good friend" of Bautista, testified for the State that Villados called Montilliano several times to check in on Bautista after Bautista was arrested and in custody. Villados's side of one of those conversations was recorded and played for the jury. In it, Villados described asking Bautista to "just take the rap" because she would likely be sentenced only to Drug Court. Villados asked Montilliano to ask Bautista to "hang on" and "stay solid" so that he could get out and bail her out.

The State argued during closing that Villados knowingly possessed the drugs and paraphernalia. As relevant to this case, the State pointed to Bautista's testimony that Villados "would weigh the drugs out in the kitchen at times" to explain why the box to the scale was found there. The State also noted that Villados was charged as a principal and/or an accomplice and argued that he was in fact the principal; "[Bautista] became the accomplice when she . . . used those drugs that came out of his fanny pack," but "[s]he took responsibility" for that act. As for the methamphetamine:

> [N]ot only was the fanny pack belonging to him, but she gave an explanation . . . that he was in knowing possession and he knew it was methamphetamine. Of course he knows.
> The way he handled the meth, the way she described it, he is sophisticated. He knows what it is. He had scales. He knew how to break it down. He knew how to work with it. He knew how to package it. They found it packaged inside the brown eyeglass case. Several empty packets, a cut sealed straw, that's drug paraphernalia. That's used as a scooper. And three packets of methamphetamine, one in a very large amount of over eight grams, and two smaller amounts. He knew how to package it. He knew how to break it down.
> When she wanted it, she had to go to him for it and he gave it to her, at least twelve to fifteen times is what she said.

The State emphasized that the jury's job "is to determine whether or not the fanny pack was his, and knowing he possessed the fanny pack and the drugs, and the two scales."

The State also argued Bautista was credible: "[Bautista] had the courage to come in and testify against her ex-boyfriend. She was under his influence at that time. He

was . . . in control of the drugs, even in control of how much she would receive from him, or drugs at that time."  The State contended that the phone call in which Villados urged Montilliano to tell Bautista to take the rap for him evinced his guilt and "show[ed] a degree of sophistication on his part, how he is going to manipulate her[.]"

Villados argued in closing that there was reasonable doubt as to whether Villados knowingly possessed the drugs, pointing to the fact that the drugs were found in a common area of the house, Marinas was also found with paraphernalia in his room, and Bautista was an interested witness in light of her plea deal.  Villados also pointed out that both Bautista and Villados shared the bedroom where the scales were found.

During rebuttal, the State emphasized that in a picture of Bautista and Villados taken during a recent trip to Honolulu (which had been entered into evidence), Villados was wearing the fanny pack.

3.   **Verdict and Sentencing**

The jury returned a verdict of guilty on both the possession and paraphernalia counts.  Villados was sentenced to ten years for the possession count and five years for the paraphernalia count, to run consecutively.  Probation was also revoked in three other criminal cases – six additional counts in total – all involving promoting a dangerous drug (in the second

11

or third degree) and paraphernalia. Villados received five years in prison for each count for which probation was revoked; four of those five-year terms ran consecutively to the sentence in this case, for a total sentence of thirty-five years' incarceration.

## B.    ICA Proceedings

Villados challenged the circuit court's admission of the following prior bad act testimony: Bautista's statements that she "saw Mr. Villados with an ounce of methamphetamine at the house, saw him use the two digital scales to break down the large amount of the drug, saw him place the drug into smaller plastic packets, and put methamphetamine into the fanny pack," and "that she was addicted to methamphetamine and that Mr. Villados had gotten the drug from the fanny pack and given it to her 'maybe twelve or fifteen times' while they were living together."[6]

The Intermediate Court of Appeals (ICA) evaluated the prior bad act evidence under this court's two-prong test: "Prior bad act evidence under HRE [R]ule 404(b) may be admissible when it is (1) relevant and (2) more probative than prejudicial," citing State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002). First, as to the relevance prong, the ICA determined

---

[6]    Villados's first appeal raised several other points of error as well, none of which are germane to his application for writ of certiorari.

that Bautista's testimony that "she saw [Villados] with methamphetamine at the house, and that she would see Villados break down the methamphetamine into smaller packets [which he] put . . . into the fanny pack . . . was probative of whether Villados had the knowledge of the methamphetamine and that he exercised dominion and control over it."  The ICA rejected Villados's argument that this evidence was offered "to portray [him] as a drug dealer"; because he was not charged with intent to distribute, this testimony was offered "to show that he knowingly possessed the methamphetamine."

Under the second prong of the HRE Rule 404(b) analysis, the ICA held that the circuit court did not abuse its discretion when it determined that the probative value of the evidence substantially outweighed its prejudicial effect.  The ICA reasoned that the circuit court properly relied on the factors set forth in Steger, 114 Hawai'i at 172, 158 P.3d at 290:

> Here, Bautista's testimony was highly probative of Villados's knowledge and intent to exercise dominion and control over the methamphetamine.  The need for the evidence was heightened by the defense's theory of the case at trial, i.e. that he was merely present in the residence and that mere proximity to the fanny pack is not enough to prove that he knowingly possessed more than one-eighth of an ounce of methamphetamine.  The potential prejudice argued by Villados, that the evidence "compelled the jury" to conclude that he was a drug dealer, was lessened by the fact that Villados was not charged with a distribution offense.  In addition, the court specifically instructed that the jury "must not be influenced . . . by passion or prejudice against the defendant" in reaching their verdict.

(Ellipsis in original.)

13

## C.    Supreme Court Proceedings

Villados now asks this court to consider whether HRE Rules 404(b) and 403 should have precluded the prior bad act evidence from being presented to the jury.[7] Villados specifically challenges the admission of testimony that (1) Villados had retrieved drugs from the fanny pack and given it to Bautista multiple times; (2) Bautista saw Villados with an ounce of methamphetamine in the house; and (3) Bautista saw Villados break down large amounts of methamphetamine using digital scales and place the drugs into smaller packets.  Villados argues that this evidence, which suggested he was a drug dealer, violated Rule 404(b) because it was used to show his propensity for drug use or dealing.  Even if it was relevant for a permissible purpose, it should have been excluded because its probative value was substantially outweighed by unfair prejudice because the testimony implied that he was dealing drugs, a more serious offense than the possession offense with which he was charged.  Villados also argues that Steger is distinguishable: the defendant in Steger was tried for a drug dealing charge in

---

    7    Villados filed a pro se certiorari application in this case in 2012, which we dismissed for lack of jurisdiction; thereafter, he moved for relief under Hawaiʻi Rules of Penal Procedure Rule 40, arguing that he was entitled to refile an application for writ of certiorari.  Villados v. State, 148 Hawaiʻi 386, 394, 477 P.3d 826, 834 (2020).  We agreed, holding that Villados must be permitted to refile his certiorari application in this case because ineffective assistance of counsel denied him the right for this court to review his direct criminal appeal on the merits.  Id.  The instant case arises from the new application in Villados's direct appeal.

addition to possession, whereas Villados was charged only with possession.[8]

The State counters that because the drugs were found in a shared dwelling and the State was required to prove constructive possession, Bautista's challenged testimony was relevant to show Villados's knowledge of the crystal methamphetamine and his intent to exercise dominion and control over it, as the ICA held. The State additionally points out that in Steger, the evidence of recent drug activity was relevant to show "knowledge and intent," with respect to the defendant's possession charge, as well as "to rebut the defense that [the defendant] was merely present in the apartment[.]"

### III. STANDARD OF REVIEW

> "Prior bad act" evidence under [HRE] Rule 404(b)
> . . . is admissible when it is 1) relevant and 2) more
> probative than prejudicial. A trial court's determination
> that evidence is "relevant" within the meaning of HRE Rule
> 401 . . . is reviewed under the right/wrong standard of
> review. However, a trial court's balancing of the
> probative value of prior bad act evidence against the
> prejudicial effect of such evidence under HRE Rule 403
> . . . is reviewed for abuse of discretion. An abuse of
> discretion occurs when the court clearly exceeds the bounds
> of reason or disregards rules or principles of law to the
> substantial detriment of a party litigant.

State v. Behrendt, 124 Hawai'i 90, 102, 237 P.3d 1156, 1168 (2010) (ellipses and brackets in original) (quoting State v. Fetelee, 117 Hawai'i 53, 62-63, 175 P.3d 709, 718-19 (2008)).

---

[8] Villados additionally asks this court to review his sentence – specifically, the credit he received for time served. Because we hold that Villados is entitled to a new trial and vacate his conviction, we do not reach the sentencing issue.

15

## IV. DISCUSSION

HRE Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Under Rule 404(b), prior bad act evidence may be admissible if admitted for a relevant purpose, such as those enumerated in the rule, besides propensity. "The list of permissible purposes in Rule 404(b) is not intended to be exhaustive for the range of relevancy outside the ban is almost infinite." Cordeiro, 99 Hawai'i at 414, 56 P.3d at 716 (quotation marks omitted) (quoting State v. Clark, 83 Hawai'i 289, 300, 926 P.2d 194, 205 (1996)). "When evidence is offered for substantive reasons rather than propensity, a trial court must additionally weigh the potential prejudicial effects of the evidence against its probative value under HRE Rule 403." Behrendt, 124 Hawai'i at 103, 237 P.3d at 1169. HRE Rule 403 provides in relevant part that otherwise-admissible evidence may nonetheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice[.]"

Villados challenges the admission of Bautista's testimony that suggested he dealt, as opposed to merely possessed, methamphetamine. He specifically challenges the

16

admission of the following testimony under HRE Rule 404(b): (1) that Villados had retrieved drugs from the fanny pack and given it to Bautista multiple times; (2) that Bautista saw Villados with an ounce of methamphetamine in the house; and (3) that Bautista saw Villados break down large amounts of methamphetamine using digital scales and place the drugs into smaller packets. The State contends that it had to prove Villados knew of and intended to control the drugs in order to establish constructive possession because the drugs were found in a common area of a shared home. Under the specific factual circumstances of this case, we agree that the prior bad acts associated with drug dealing here were relevant to prove Villados's intent to possess the drugs found in the common area. But for the following reasons, we agree with Villados that the evidence was inadmissible because its probative value was substantially outweighed by its prejudicial effect.

"The balance between the [Rule 404(b)] evidence's probative value and prejudicial effect is 'predicated upon an assessment of "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility."'" State v. Martin, 146 Hawaiʻi 365, 383-84, 463 P.3d 1022, 1040-41 (2020) (quoting State v. Uyesugi, 100 Hawaiʻi 442, 463, 60 P.3d 843, 864 (2002)). We have previously "underscore[d] the importance of

17

the need factor[.]" <u>State v. Clark</u>, 83 Hawaiʻi 289, 303, 926 P.2d 194, 208 (1996) (citation omitted). In this case, the State's need was scant and alternative proof highly efficacious because Bautista testified directly to the fact that the prior bad acts only showed circumstantially:

> [State:] . . . . [D]o you recognize what's inside that brown eyeglass case?
> [Bautista:] Yeah.
> Q. What is that?
> A. It is methamphetamine. It's dope.
> Q. Methamphetamine?
> A. Yes.
> Q. Okay.
> And who did that belong to?
> A. Junior.
> Q. Junior?
> A. Uh-huh.
> Q. Okay. Now, the day the police came into the house and searched the house, was this methamphetamine and this fanny back and the brown eyeglass case, was that all belonging to Junior?
> A. Uh-huh.
> Q. And how about the money that was found in the photo?
> A. That's Junior's.
> . . . .
> Q. And the two IDs there, did one of them belong to you?
> A. Yes. That was my ID, but I kept that one in my drawer because I couldn't use it.
> Q. Okay. So that is a State ID belonging to you?
> A. Yes.
> Q. Did you put it in the fanny pack?
> A. No.
> Q. Did you put drugs in the fanny pack?
> A. No.
> Q. Did you ever go inside the fanny pack?
> A. No.
> Q. After the defendant bought it, did he ever let you handle it?
> A. No.

In addition to Bautista's direct testimony that the drugs belonged to Villados, there was also other admissible circumstantial evidence that Villados knowingly possessed the drugs. Bautista testified that she went with Villados when he

18

bought the Maui Built fanny pack and eyeglass case, and the State introduced a photograph of Villados wearing the Maui Built fanny pack. By contrast, the testimony that Villados had previously had large quantities of methamphetamine in the house and broke it down into smaller packets only circumstantially suggests that later-recovered drugs belonged to him. Therefore, in light of ample other evidence supporting the inference that Villados knowingly possessed the drugs, the Rule 404(b) evidence was "unnecessary overkill[.]" State v. Austin, 70 Haw. 300, 309, 769 P.2d 1098, 1103 (1989).

Moreover, the nature of the challenged evidence was likely to "rouse the jury to overmastering hostility." Martin, 146 Hawai'i at 383-84, 463 P.3d at 1040-41 (citation omitted). Respectfully, we disagree with the ICA in this case that the prejudicial effect of evidence "that he was a drug dealer[] was lessened by the fact that Villados was not charged with a distribution offense." Rather, in our view, that he was not charged with a distribution offense heightened the risk the jury would make the impermissible propensity inference because, as Villados argued, drug dealing is "viewed as reprehensible in the community at large" and "implicated him in far more sinister activity than mere possession."[9] The jury may have made the

---

[9] One juror submitted a question for Officer Esperanza that, while ultimately not asked on the grounds that it was irrelevant, at least suggests that whether Villados was a user or a dealer – and that the former was less

improper character inference that, "because [Villados] was a person of criminal character, it was likely that he committed the crime for which he was on trial." State v. Pinero, 70 Haw. 509, 518, 778 P.2d 704, 711 (1989). And indeed, because the prior bad acts were worse in kind than the crime for which he was tried, the "probability of a hostile reaction against [Villados]" was greater. Id.; Behrendt, 124 Hawai'i at 108, 237 P.3d at 1174 ("[Differences between the prior bad acts and charged crimes] are relevant considerations which could, depending on the circumstances, provide a basis for limiting such evidence or excluding it altogether[.]"); cf. United States v. Stout, 509 F.3d 796, 803 (6th Cir. 2007) (affirming the exclusion of prior bad act evidence when "the prior bad acts in this case were significantly worse than the acts charged").

Additionally, during closing arguments, the State emphasized that Villados was "sophisticated" when it came to drugs, and that he controlled Bautista's drug use:

> The way he handled the meth, the way she described it, he is sophisticated. He knows what it is. He had scales. He knew how to break it down. He knew how to work with it. He knew how to package it.
> . . . .
> [Bautista] was under his influence at that time. He was . . . in control of the drugs, even in control of how much she would receive from him, or drugs at that time.

culpable than the latter – was on the jurors' minds. The proposed question was: "Upon what information was the warrant issued? I.E. did the police believe the defendant was a dealer or was he just seen as a user?"

See State v. Gallagher, 146 Hawai'i 462, 475, 463 P.3d 1119, 1132 (2020) (explaining that the use of the prior bad act evidence during closing argument "likely exacerbated" the prejudicial effect).

Other factors to consider when conducting the Rule 403 balancing test include "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, [and] the interval of time that has elapsed between the crimes[.]" Behrendt, 124 Hawai'i at 106, 237 P.3d at 1172 (quoting State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992)). The State did not argue that Bautista must have possessed the seized methamphetamine because it was the same methamphetamine that Bautista observed on prior occasions – rather, the State's argument was that methamphetamine in the house had previously belonged to Villados and so it must have on this occasion, too. Accordingly, these factors have less probative value than they might under other circumstances. Cf. Gallagher, 146 Hawai'i at 472, 463 P.3d at 1129 ("[A] close proximity in time and nature between the prior misconduct and the charged offense may also increase the likelihood that a jury will consider the previous conduct to conclude that the defendant has a propensity for committing such acts, which is a prohibited inference. . . . [W]hen the evidence is not offered for a purpose for which similarity in time and nature is

21

probative, a close unity between the acts potentially weighs against admitting the evidence when it increases the chances of unfair prejudice."). As above, the prior acts were crucially different in that they involved conduct consistent with drug dealing, an offense viewed as more morally culpable than the mere possession charge for which he was tried.

The parties have repeatedly pointed to the ICA opinion in State v. Steger as central to the issues in this case. Steger also involved a drug raid of a home in which three people, including the defendant, lived. 114 Hawaiʻi at 165, 158 P.3d at 283. The police found methamphetamine in a common area, along with a bag containing Steger's ID and almost $3,000 in cash. Id. Additionally, other drugs, paraphernalia, and a pistol were found in the kitchen alongside Steger's cell phone and laptop. Id. Steger was charged with several counts of drug possession and distribution. Id. at 164, 158 P.3d at 282. At trial, one of Steger's roommates, Cruz, testified about her observation of Steger's drug-related activities during the two-month period preceding the execution of the search warrant, when she lived with Steger:

> Among other things, Cruz testified that during this time period, she saw Steger package crystal methamphetamine into plastic packets and sell crystal methamphetamine out of his truck. She also saw quantities of crystal methamphetamine in the apartment that were consistent with the approximately four ounces seized by the police. Cruz testified that Steger obtained crystal methamphetamine and Ecstasy through packages sent in the mail. She recounted one incident in which Steger, in her presence, opened a

22

> package he had just picked up from the post office. The package contained baggies of crystal methamphetamine. Cruz further testified that Steger made bongs, used crystal methamphetamine and Ecstasy in her presence, and gave her illegal drugs to use.

Id. at 171, 158 P.3d at 289.

The ICA concluded that Cruz's testimony did not violate HRE Rule 404(b). First, the evidence "was directly relevant to proving Steger's knowledge and intent with respect to the drugs found in the apartment," both because the State "was required to prove that Steger knowingly possessed at least one ounce of methamphetamine to establish the [possession] offense," and because the State also had to "prove that Steger intended to distribute at least 25 tablets of Ecstasy[.]" Id. at 172, 158 P.3d at 290. The ICA held that Cruz's testimony was probative of whether Steger had the "requisite criminal intent," but did not distinguish between the possession and distribution charges. Id. The ICA also held that "the probative value of Cruz's testimony regarding Steger's other drug activities was not substantially outweighed by the danger of unfair prejudice." Id. at 173, 158 P.3d at 291. In addition to being probative of Steger's mens rea, "Steger attempted to place the blame for the [drugs] on his co-defendant," the third roommate in the house, and so the prior bad act evidence "refute[d] his defense that he was merely present in the apartment[.]" Id. The ICA reasoned that Steger's portrayal of himself at trial as a drug user in

23

order "to explain how he could be present in an apartment filled with drugs and yet not be responsible for the distribution quantities" found therein mitigated any risk of unfair prejudice from the jury's general hostility to drug use.  Id.  Finally, the ICA determined there was "a substantial need for Cruz's testimony" because "the other evidence of Steger's knowledge and intent was circumstantial[.]"  Id.

        As explained above, we agree with the ICA that prior bad acts associated with drug dealing may be relevant to prove the requisite intent both for possession and distribution under the specific factual circumstances presented by Steger and this case, in which the State must prove who possessed drugs found in the common area of a shared home.  However, with respect to the HRE Rule 403 balancing analysis, the circumstances in this case are meaningfully different than Steger.  Unlike the defendant in Steger, Villados was not charged with a drug crime requiring the intent to distribute, and the State's need for the evidence here was not as pronounced as in Steger.  Mere possession often can be – and in this case was – established using less prejudicial evidence.  Moreover, Villados, unlike Steger, did not "inject[] his prior involvement with drugs into the trial by characterizing himself as a heavy methamphetamine user."  Id. Thus, the prejudicial effect of the testimony was far more

24

pronounced in the instant case. Accordingly, we do not view Steger as dispositive here.

Thus, we conclude that the circuit court abused its discretion when it determined that the probative value outweighed the prejudicial effect of the testimony that Villados had retrieved drugs from the fanny pack and given it to Bautista multiple times, that Bautista saw Villados with an ounce of methamphetamine at the house, and that Bautista saw him break it down into smaller plastic packets. There is "a reasonable possibility that the error complained of might have contributed to the conviction." Gallagher, 146 Hawai'i at 481, 463 P.3d at 1138 (quoting State v. Mundon, 121 Hawai'i 339, 368, 219 P.3d 1126, 1155 (2009)). Although substantial admissible evidence supported the key inference that the drugs belonged to Villados, there is a reasonable possibility that the jury "decide[d] the case on a basis unrelated to th[e] elements [of the offense]" – that is, the jury may have convicted Villados based on the unfairly prejudicial inference that he was a drug dealer and therefore deserved to be convicted. Id. at 482, 463 P.3d at 1139. Villados is therefore entitled to a new trial.

## V. CONCLUSION

For the foregoing reasons, the ICA's January 8, 2021 judgment on appeal is vacated. The circuit court's April 15, 2010 judgment of conviction is vacated, and this case is

25

remanded to the circuit court for proceedings consistent with this opinion.

DATED: Honolulu, Hawai'i, August 25, 2021.

Mark M. Murakami and
Joanna C. Zeigler
for petitioner

Mark R. Simonds
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

